[No. B104613. Second Dist., Div. Four. Dec. 2, 1997.]

MOUNT OLYMPUS PROPERTY OWNERS ASSOCIATION, INC., Plaintiff and Respondent; MICHAEL G. ROSS, Plaintiff and Appellant, v. BORIS SHPIRT et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I.B.1., I.B.3., I.B.4., II.A. and II.B.

886

**COUNSEL**

Richards, Watson & Gershon and Gary E. Gans for Plaintiff and Appellant.

Reznik & Reznik, Benjamin M. Reznik, Richard A. McDonald, Jeffrey S. Raskin, Jeffer, Mangels, Butler & Marmaro, Benjamin M. Reznik and Monica D. Witt for Defendants and Appellants.

Douglas I. Pollock for Plaintiff and Respondent.

## OPINION

**BARON, J.**—Boris and Jenny Shpirt appeal from a judgment granting Michael G. Ross and the Mount Olympus Property Owners Association, Inc. (MOPOA) injunctive relief and punitive and general damages, and from a posttrial order awarding attorney fees to Ross. In a separate cross-appeal, Ross seeks amendment of the judgment to include a previously granted order on summary adjudication. We affirm the judgment insofar as it pertains to injunctive relief and damages, but reverse the award of attorney fees, remanding the case to the trial court for consideration of one issue: whether to award under section 2033, subdivision (o) of the Code of Civil Procedure the reasonable expenses incurred in proving the genuineness of any document or the truth of any matter, which expenses would not have been incurred but for the Shpirts' refusal to admit such matters when requested to do so.

I.

## APPEAL

### A. *Factual and Procedural Background*

The preliminary facts which led to the initiation of the lawsuit underlying this appeal are almost entirely undisputed. In November of 1988, appellants and cross-respondents the Shpirts purchased a home at 2121 Mount Olympus Drive, located in the Mount Olympus area of Laurel Canyon. Respondent and appellant Ross lived next door at 2129 Mount Olympus Drive. The Shpirts wished to remodel their house, intending to greatly enlarge it and add a second story.

A "Declaration of Establishment of Restrictions" had been recorded for the tract in which both properties were located. (This document shall hereinafter be referred to as the CC&R's.) The successor in interest to the "Declarant" under the CC&R's, and the entity responsible for approving alterations to existing structures, was respondent MOPOA. The Shpirts twice submitted plans to MOPOA, which were rejected because of its dissatisfaction with the proposed structure. The Shpirts then submitted some preliminary drawings to which MOPOA gave tentative approval subject to, among

other more minor conditions, submission of final plans and the Shpirts' agreement to indemnify MOPOA should it be sued by Ross. The Shpirts did not fulfill the conditions, but instead demolished a portion of the existing home and allowed the property to fall into a state of disrepair.[1]

### 1. *The CC&R's*

The CC&R's included a provision that "[n]o building, fence, wall, pole or other structure shall be erected, constructed, altered or maintained upon any portion of said property, unless a complete set of plans and specifications therefor . . . shall have been submitted to and approved in writing by Declarant . . . ." Approval could be withheld due to "reasonable dissatisfaction of Declarant with the grading plan, location of the structure on the building site, the color scheme, finish, design, proportions, architecture, shape, height, style or appropriateness of the proposed structure or altered structure, the materials used therein, the kind, pitch or type of roof proposed to be placed thereon, or because of its reasonable dissatisfaction with any or all other matters or things which, in the reasonable judgment of Declarant, would render the proposed structure or alteration inharmonious or out of keeping with the general plan of improvement of said property or with the structures erected on other building sites in the immediate vicinity of the building site on which said structure is proposed to be erected or altered."

Paragraph 8.01 of the CC&R's further provided that "[i]n the event any structure or any part thereof on any portion of said property shall be damaged or destroyed by any cause, the owner of the building site upon which the same is located shall within ninety (90) days from and after the date of such damage or destruction commence and within one (1) year after the date of such damage or destruction complete the repair or reconstruction of said structure." Paragraph 10.04 of the CC&R's obligated "the owners of lots and building sites . . . to perform all duties incident to maintaining their respective lots and building sites including vegetation thereon, in neat, clean and good order."

### 2. *The Indemnity Agreement*

In March of 1992, MOPOA entered into an agreement with Ross under which Ross and MOPOA agreed to file and prosecute a lawsuit against the Shpirts to prevent them from constructing a building which would infringe on the rights of Ross as set forth in the CC&R's and which had not been

---

[1]The parties disputed whether the Shpirts intentionally demolished a portion of the existing structure or whether the approved construction of a retaining wall caused a portion of the house to collapse. For purposes of appeal, we accept the findings of the trial court as true.

approved by MOPOA. The agreement gave Ross "the exclusive right to decide and determine whether any claim or cause of action brought in the Lawsuit against Shpirt shall be prosecuted, compromised, tried, appealed or dismissed," and required "Ross's prior written approval" before MOPOA could "approve any plans for any proposed construction at 2121 Mount Olympus Drive," unless "all claims and disputes between Ross and Shpirt, as set forth in the Lawsuit, have been resolved, or unless ordered to do so by the Court."

The agreement between Ross and MOPOA also contained an assignment of "all of [MOPOA's] rights to recover attorney's fees in the Lawsuit, including awards of sanctions" unless "Ross and [MOPOA] are awarded attorney's fees in excess of the amount expended by Ross or his own counsel, and the amount expended by Ross pursuant to his indemnity of [MOPOA] . . . ." In return, Ross agreed "to indemnify and hold harmless [MOPOA], and its directors and officers, from any claim, action or suit for liability or damages arising directly from the Lawsuit," and agreed "to indemnify [MOPOA] for legal fees and costs incurred in prosecuting the Lawsuit."

### 3. *The Complaint and Cross-complaint*

In April of 1992, Ross and MOPOA (hereafter respondents) jointly sued the Shpirts for enforcement of equitable servitude, nuisance, enforcement of easement, and breach of contract.[2] The complaint alleged that the Shpirts had commenced demolition of the existing house in October 1991, before plans had been approved by MOPOA. Respondents sought an injunction preventing the Shpirts from erecting or constructing a house without the approval of MOPOA or from erecting or constructing a house which interfered with or reduced the view from Ross's property, and an award of attorney fees under paragraph 12.04 of the CC&R's.[3] The nuisance claim was based on the accumulation of garbage on the property, the existence of garbage containers and portable toilets in front of the house, the presence of construction materials, weeds, broken windows, and stagnant water on the property, and construction noise from 7 a.m. until 6 p.m. Ross also alleged entitlement to an easement "consisting of an unobstructed view to the south and west of the Ross Property, i.e. of Laurel Canyon and the City of Los Angeles." The breach of contract claim was based on violation of the CC&R's by failing to keep the property in good repair under paragraph 8.01.

---

[2]Although the complaint was jointly filed, both parties maintained separate counsel, and often filed separate papers on issues which arose during the course of the litigation.

[3]Paragraph 12.04 provided in relevant part: ". . . In any legal or equitable proceeding by Declarant for the enforcement, or to restrain a violation of, this Declaration or any provisions hereof, the losing party or parties shall pay the attorneys' fees of the winning party or parties in such amount as may be fixed by the court in such proceeding."

The Shpirts cross-claimed against Ross and MOPOA for conspiracy to induce breach of contract and interfere with prospective business relations. The cross-complaint alleged that the Shpirts had submitted plans to MOPOA for consideration in 1992 in accordance with the preliminary approval obtained, but that MOPOA refused to consider the plans because it had entered into the indemnity agreement with Ross under which Ross held veto power over any proposed construction on their property. The Shpirts sought an injunction requiring MOPOA to review the plans which had been submitted. The Shpirts also sought declaratory relief. They claimed that delay in obtaining approval for the construction jeopardized their ability to obtain favorable financing. Finally, the Shpirts accused Ross of trespass.

### 4. Trial and Settlement With MOPOA

As discussed in greater detail in connection with the cross-appeal (unpublished part of opn.), the Shpirts' cross-complaint and Ross's claim for view easement were resolved by summary adjudication. The claims for enforcement of equitable servitude, nuisance, and breach of contract were tried to the court. In the middle of trial, the Shpirts settled with MOPOA. Under the agreement, the Shpirts agreed to pay the sum of $35,000 to MOPOA for failure to maintain their property in neat, clean, and good order, and MOPOA stipulated to waive its right to file a motion for attorney fees and dismissed its own claim for breach of contract.[4] MOPOA stayed in the case for the purpose of being bound by any judgment issued by the court as to injunctive relief.

Ross presented evidence that the Shpirts allowed large quantities of water to stagnate in their pool, which was directly under his window, such that he could smell a rancid odor emanating from it. The pool became a breeding ground for mosquitoes, and the City of Los Angeles Department of Health Services sent mosquito abatement teams out at least six times. Ross was bitten repeatedly over a five-year period.

On June 5, 1990, shortly after he had a meeting with the Shpirts about their proposed construction, music was blasted from the Shpirts' property from 7 a.m. until 10 p.m. at night. The music could be heard even with the windows closed. When Ross complained to the Shpirts, they responded by adding a second radio on a property they owned on the other side of Ross. The devices playing the music appeared to be on timers since they started every morning at 7 a.m. Ross reported the disturbance to the police on more than one occasion and asked the Shpirts to turn the volume down several times. He wrote a letter to the Shpirts informing them that the music was

---

[4]MOPOA also agreed to expedite approval of any plans submitted by the Shpirts in the future after the litigation was concluded.

" 'interfering with my sleep and peaceful enjoyment of my premises[.]' " He also obtained a temporary restraining order which the Shpirts ignored. The music-playing ended sometime between the end of June and the early part of July, after Ross obtained a preliminary injunction.

Ross also attested to the general state of disrepair at the Shpirt premises and showed pictures of construction debris, accumulated trash, overgrown weeds, and a partially demolished structure. Ross testified that he had "anxiety," when he viewed appellants' house, and that he was "embarrassed" and "angry." He testified that it "affects [his] personality . . . it's like being forced to live next to a junkyard," and has "a radical effect on [his] whole mental state every time [he] ha[s] to take a look at it and know what's gone on and what [they]'ve gone through, and what it appears [they] will have to continue to go through for God knows how long." He referred to the inability of being able to use his backyard or entertain because of the mosquitos, and the "whole anxious, irritating mental state" which "goes along with having to view it and see it. [¶] . . . You can't miss it, so it's a constant source of aggravation and embarrassment and humiliation of unnecessary explanation to both new friends and old." He told of why he no longer gardened: ". . . When you have a rose garden and you go to plant your roses and you look at them and immediately on the other side of your roses are weeds, and trash, and glass, and broken bottles, and broken concrete, and dried-out wood and everything else, it kind of takes the fun and the beauty out of the gardening." He testified he had lost sleep, and developed an ulcer and tinnitus. Concerning the period of time when the music was playing, he said: ". . . Mr. Shpirt's playing of the music perpetually, on what was almost a 24-hour-a-day basis for almost a week, was interfering with my ability to sleep, concentrate, deal with my family, my wife, my step-son, and my overall ability to enjoy my home."

### 5. *The Trial Court's Findings*

Based on the evidence presented, the court found that the Shpirts had breached the CC&R's and created a nuisance. The court specifically found that the Shpirts "demolished substantial portions of the residence at 2121, piling dirt, debris, building materials or scrap and appliances on the site, on the sidewalk and in the street for periods varying from weeks to months and years." In addition, "[the Shpirts] allowed their swimming pool for weeks and months to accumulate dirt, debris and scum." The court believed Ross's testimony that "the daily view of [the Shpirts'] property made him sick," and that "[the Shpirts'] conduct caused or triggered ulcers." The court concluded that the Shpirts "acted wilfully and with malice in demolishing portions of the structure at 2121, knowing that they had no permission to rebuild; in

using and maintaining the location as a dump and construction site; in abandoning the maintenance of their swimming pool, knowing that the pool was just below plaintiff Ross'[s] window; [and] in playing radios on unoccupied property." The court awarded Ross $40,000 in general damages "for his physical and emotional distress in being exposed to defendants' conduct." The court later awarded $50,000 as exemplary damages and $218,000 for attorney fees paid to Ross's counsel, plus $5,812 for the portion of attorney fees incurred by MOPOA to which Ross was entitled under the indemnity agreement.

The court specifically determined both that Ross was incorrect in his contention that he was "entitled to maintain the view he has enjoyed since 1981" and that the Shpirts were incorrect in asserting that Ross was not entitled to any view under the CC&R's. According to the court, "Mt. Olympus is . . . a view development, and the criteria of 'location, design, proportions, architecture, shape, height, style, or appropriateness' reasonably encompasses the factor of a 'view.'"

In accordance with these findings, the court issued a permanent injunction preventing the Shpirts from: "Erecting, constructing, improving or altering any building, wall, structure or other improvement on the real property at 2121 Mount Olympus Drive (the 'Shpirt Property') without the prior written approval of [MOPOA]." The Shpirts were likewise not to erect or construct "any building, wall, structure or other improvement on the Shpirt Property containing a second story which unreasonably interferes with or reduces the view from the existing house at 2129 Mount Olympus Drive of Laurel Canyon or the City of Los Angeles, unless defendants, their successors or assigns have obtained the approval of MOPOA." The Shpirts were further "enjoined and directed to clear and render the Shpirt Property in neat and clean condition, within 90 days, and to maintain the Shpirt Property in a neat and clean condition thereafter."

B. *Discussion*

1. *Emotional Distress**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

2. *Ross's Attorney Fees*

█ The second question to be considered in connection with the appeal is whether the trial court erred in granting attorney fees or in the amount of fees awarded.

---

*See footnote, *ante*, page 885.

After judgment, Ross claimed entitlement to attorney fees on four separate grounds: (1) Civil Code section 1354;[6] (2) paragraph 12.04 of the CC&R's; (3) the indemnity agreement's assignment of MOPOA's rights to attorney fees; and (4) Code of Civil Procedure section 2033.[7] He sought attorney fees in the total amount of $380,228.25. This included $246,213.75 out of a total of $268,592.75 billed by Gary Gans, who had represented Ross, and $134,014.50 billed by Douglas I. Pollock, who had represented MOPOA. Ross conceded he was not entitled to recover attorney fees for time spent in seeking damages for nuisance and punitive damages, and his attorney stated that such amounts had been deleted from the amount sought. The declarations indicated that he had attributed approximately $20,000 to these claims.

The trial court ruled: ". . . Ross is entitled to attorneys fees under CC section 1354 (f) but is not entitled to attorneys fees under the CC&R's. [¶] The CC&R's involve a 'common interest development' (CC 1352) because it is undisputed . . . MOPOA owns and pays taxes on a small landscaped parcel. [¶] The CC&R's, however, clearly exclude the award of attorneys fees in actions brought by individual homeowners, in contrast to actions brought by the Association. Although Section 12.01 provides that the CC&R's are enforceable by either the 'Declarant' (MOPOA) and the owners, Section 12.04 provides for attorneys fees only to the Declarant. CC Section 1717 and the cases cited by plaintiff involve reciprocity; here, neither a plaintiff nor a defendant homeowner could recover attorneys fees under the CC&R's in an action between homeowners. [¶] Plaintiff Ross, however, is entitled to attorneys fees under the Indemnity Agreement between plaintiffs MOPOA and Ross. (Such an assignment is specifically authorized by the CC&R's, Section 12.01.) Defendants Shpirt knew about the assignment years ago, certainly, before entering into the settlement agreement with plaintiff MOPOA."

Turning to the appropriate amount of fees to award, the court concluded: ". . . Ross is entitled to recover all attorney's fees under both the Indemnity Agreement and Civil Code Section 1354 (f) incurred to enforce the building restriction and nuisance provisions of the CC&R's. This means that Ross is entitled to recover all attorney's fees, except those fees incurred in litigating

[6]The Davis-Stirling Common Interest Development Act, Civil Code section 1350 et seq., permits any owner of a separate interest in a "common interest development" to enforce the covenants and restrictions set forth in the declaration. (Civ. Code, § 1354, subd. (a).) Section 1354, subdivision (f), entitles any prevailing party, in an action under subdivision (a) to enforce the governing documents, to an award of reasonable attorney fees.

[7]Code of Civil Procedure section 2033, subdivision (o), permits recovery of the expense of establishing the genuineness of a document or the truth of any matter, including reasonable attorney fees, when the losing party failed to admit these matters in response to a request for admission.

the money damages portions of Ross' action. Ross has allotted only $20,000 to the money damages portion of this litigation. Although that allocation does not seem adequate, in fact the substance of Ross' action was encompassesd [*sic*] by the CC&R's. The court will award $218,000 for Ross' own attorney's fees."[8]

The court next considered what portion, if any, of MOPOA's attorney fees to award to Ross. Pollock stated in a supplemental declaration that of the $134,014.50 incurred by MOPOA, $5,812.75 represented amounts expended on joint claims which were the only attorney fee amounts MOPOA intended to assign to Ross. Of that amount $2,500 had been reimbursed by Ross prior to the settlement, and $3,312.75 represented time spent by Pollock on joint claims since the settlement. Since MOPOA did not intend to settle any joint claims in its settlement agreement with the Shpirts, this amount was not subject to the settlement agreement. The trial court concurred in that analysis and added the amount suggested by MOPOA's counsel to Ross's attorney fee award.

The parties dispute whether the Mount Olympus tract is a common interest development for purposes of the Davis-Stirling Common Interest Development Act (the Act). The parties focus on the portion of the Act that defines a common interest development as "(1) A community apartment project. [¶] (2) A condominium project. [¶] (3) A planned development. [¶] (4) A stock cooperative." (Civ. Code, § 1351, subd. (c).) The statute further defines "planned development," the only category possibly applicable here, as follows: " 'Planned development' means a development (other than a community apartment project, a condominium project, or a stock cooperative) having either or both of the following features: [¶] (1) The common area is owned either by the association or in common by the owners of the separate interests who possess appurtenant rights to the beneficial use and enjoyment of the common area. [¶] (2) A power exists in the association to enforce an obligation of an owner of a separate interest with respect to the beneficial use and enjoyment of the common area by means of an assessment which may become a lien upon the separate interests in accordance with Section 1367." (Civ. Code, § 1351, subd. (k).)

Civil Code section 1374 goes on to state that "[n]othing in this title may be construed to apply to a development wherein there does not exist a common area as defined in subdivision (b) of Section 1351, nor may this

---

[8]To the extent the court found that the indemnity agreement entitled Ross to recover attorney fees personally incurred by him, such finding is not supported by the evidence. The agreement obligated Ross to indemnify MOPOA for the cost of attorney fees incurred by MOPOA, and granted him a coextensive right to recover such fees from the Shpirts. It did not, and could not, assign to Ross a right to recover his own fees.

title be construed to confer standing pursuant to Section 383 of the Code of Civil Procedure to an association created for the purpose of managing a development wherein there does not exist a common area." (Civ. Code, § 1374.) "Common area" is defined by Civil Code section 1351, subdivision (b), as "the entire common interest development except the separate interests therein."

Respondents argue, and so persuaded the trial court, that the Mount Olympus tract fell within the definition of planned development under Civil Code section 1351, subdivision (k)(1) because MOPOA owns two small plots of land on which the sign for the tract is located. The Shpirts contend that the Act does not apply because MOPOA does not own all streets, roads, open spaces, or other property within the neighborhood that is not separately owned by the individual property owners.

By concentrating on the definitional provisions of the Act rather than the general provision which governs its application, both sides misdirect their focus. The scope of the Act is set out in Civil Code section 1352 which provides: "This title applies and a common interest development is created whenever *a separate interest coupled with an interest in the common area or membership in the association is, or has been, conveyed*, provided, all of the following are recorded: [¶] (a) A declaration. [¶] (b) A condominium plan, if any exists. [¶] (c) A final map or parcel map, if Division 2 (commencing with Section 66410) of Title 7 of the Government Code requires the recording of either a final map or parcel map for the common interest development." (Italics added.)

The evidence at trial established that MOPOA owned and maintained two small plots of land on one of which the Mount Olympus sign is located. It did not establish that a "separate interest coupled with an interest in the common area or membership in the association" had been conveyed. Indeed, it is clear from testimony at trial that there was no mandatory membership in MOPOA, and that it was a purely voluntary association of homeowners with no power to charge or collect assessments.

In interpreting a statute, we are bound to give credence to its express terms unless some overarching statutory purpose compels us to depart from them. For a development to fall within the governance of the Act, the statutory requirements are clear: (1) there must exist a common area owned either by the association or "by the owners of the separate interests who possess appurtenant rights to the beneficial use and enjoyment of the common area" (Civ. Code, §§ 1351, subd. (k)(1), 1374); (2) there must have been recorded "[a] declaration," "[a] condominium plan, if any exists," and "[a] final map or parcel map" (*id.*, § 1352); and (3) there must have been

conveyed "a separate interest coupled with an interest in the common area or membership in the association" (*ibid.*). Respondents failed to establish that the latter criteria had been met.[9]

Respondents contend that any error in awarding attorney fees to Ross under Civil Code section 1354, subdivision (f), is harmless because the identical fees could have been awarded under the CC&R's. We see no reason to disturb the trial court's ruling in this regard. As the court noted, paragraph 12.01 of the CC&R's permits both MOPOA and individual homeowners to enforce its provisions, but paragraph 12.04 specifies that fees are awardable only to "Declarant" (MOPOA). The CC&R's do not assist Ross in his quest for attorney fees.

Although we hold that the court erred in awarding attorney fees under Civil Code section 1354, subdivision (f), we note that Ross also sought fees pursuant to Code of Civil Procedure section 2033, subdivision (o), which allows recovery of attorney fees provided they can be linked to a failure to admit facts proven at trial. The trial court did not rule on the issue of fees awardable under section 2033, reasoning that that point was rendered moot by virtue of the other fees awarded. The case must be remanded for consideration of this question.

3., 4.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## II.

### THE CROSS-APPEAL

A., B.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is affirmed. That portion of the court's posttrial order awarding attorney fees to Ross under the indemnity agreement in the amount

---

[9] In *Gantman* v. *United Pacific Ins. Co.* (1991) 232 Cal.App.3d 1560 [284 Cal.Rptr. 188], cited extensively by the parties in their briefs and at oral argument, the issue was whether the association or the individual homeowners had standing to sue an insurer where the association was the named insured. The court held that the association should be treated as a separate entity under Civil Code section 1363. (232 Cal.App.3d at p. 1566, fn. 4.) In that case, the CC&R's "cause[d] each residential lot owner to be a member of [the] Association." (*Id.* at p. 1564.)

*See footnote, *ante*, page 885.

of $5,812.75, representing fees incurred by MOPOA and assigned to Ross, is affirmed. That portion of the order awarding attorney fees to Ross under Civil Code section 1354, subdivision (f) and the indemnity agreement, in the amount of $218,000, representing fees incurred by Ross, is reversed and the case is remanded for consideration of whether to award fees pursuant to section 2033, subdivision (o) of the Code of Civil Procedure for reasonable expenses incurred in proving the genuineness of documents and the truth of matters which the Shpirts failed to admit in response to a formal request. Each party is to bear his, her, or its own costs on appeal.

Vogel (C. S.), P. J., and Hastings, J., concurred.

A petition for a rehearing was denied December 22, 1997, and the opinion was modified to read as printed above. The petition of appellant Michael G. Ross for review by the Supreme Court was denied February 25, 1998.